Maeve E. Cannon
STEVENS & LEE
510 Carnegie Center Drive, Suite 400
Princeton, New Jersey 08540
(609) 243-6423
maeve.cannon@stevenslee.com

Cara R. Burns (Pro Hac Vice to be Requested)
MIMS, KAPLAN, BURNS & GARRETSON
28202 Cabot Road, Suite 300
Laguna Niguel, California 92677
(310) 314-1721
cburns@hmkblawyers.com

Attorneys for Plaintiff,
Merch Traffic, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MERCH TRAFFIC, LLC,**<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>**JOHN DOES 1-100, JANE DOES 1-100, and XYZ COMPANY,**<br><br>        **Defendants.** | **ACTION NO. 2:26-cv-3738 SRC-AME**<br><br>**DECLARATION OF EMILY HOLT IN SUPPORT OF EX PARTE APPLICATION FOR A SEIZURE ORDER, AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION AND SEIZURE ORDER SHOULD NOT ISSUE** |

I, Emily Holt, hereby declare as follows:

1.    I make this declaration in support of Merch Traffic, LLC's ("Plaintiff")

ex-parte application for: a temporary restraining order; seizure order; and an order

to show cause why a preliminary injunction and seizure order should not issue in the above referenced matter to halt the sale of merchandise and to seize the same bearing the "Group's Trademarks", namely the federally registered trademarks, service marks, likenesses, logos and other indicia of the performing group **"BRUCE SPRINGSTEEN & THE E STREET BAND"** or its individual band member **"BRUCE SPRINGSTEEN"** or the group **"E STREET BAND"** (all collectively, the "Group") during their nationwide tour including on Monday, April 20, 2026 at the Prudential Center in Newark, New Jersey. The tour has just begun and, as set forth herein, Defendant Bootleggers have appeared selling their infringing merchandise. *See infra*. Similar seizure orders have been granted by this District Court for other performers' tours, and by other District Courts for this Group and other performers. See Certificate of Counsel and Exhibits thereto, including: Merch Traffic v. Does, Case No. 25-cv-13960 KSH (D. NJ 2025) (Judge Hayden) (for the Jonas Brothers' tour); Live Nation v. Does, Case No. 2:20-CV-1357 ES (D. NJ 2020) (Judge Salas) (for Post Malone's tour); Merch Traffic, LLC v. Does, Case No 23-cv-2459 (S.D.NY 2023) (Judge Abrams) (for Bruce Springsteen & the E Street Band's tour); and Live Nation v. Does, Case No 16-cv-0336 (S.D.NY 2016) (Judge Kaplan) (for Bruce Springsteen & the E Street Band's tour), among others. I have personal knowledge of the facts set forth herein and am authorized by Plaintiff to

make this declaration.  If called as a witness, I could and would be able to testify competently to such facts.

2.      Plaintiff is engaged in the business of manufacturing, distributing and selling authorized merchandise such as T-shirts, sweatshirts, and posters, among other merchandise bearing the trademarks, service marks, likenesses, logos, and other indicia owned by popular performers (collectively "Tour Merchandise"). Plaintiff has obtained the exclusive right to distribute authorized Tour Merchandise bearing the Group's Trademarks (collectively "Authorized Tour Merchandise") at all of the Group's concerts in the United States and elsewhere (the "Tour") A true and correct copy of the Group's Tour dates is attached as Exhibit A and is incorporated by this reference as though fully set forth herein.

3.      I am the Vice President of Business and Legal Affairs for Plaintiff, formerly known as Live Nation Merchandise, Inc., which previously acquired the merchandising company F.E.A., Inc.   I have been employed by Plaintiff for approximately 4 years and previously at Bravado International Group Merchandising Services, Inc. for approximately 5 years in a similar position. Before these, I worked at Burberry, PLC (the Burberry fashion brand) in the Brand Protection division working specifically on assessing counterfeit and other trademark violations of the brand, and at private law firms specializing in intellectual property antipiracy and protection matters.  I also studied at the World Intellectual

3

Property Organization (also known as "WIPO") in Geneva, Switzerland, a leading intellectual property organization that is an agency of the United Nations that promotes the protection of intellectual property throughout the world. As part of my duties at Plaintiff, I oversee Plaintiff's merchandising and antipiracy efforts for performers' tours and online sales.

4. **"BRUCE SPRINGSTEEN & THE E STREET BAND"** is the federally registered trademark of one of the world's most prominent and successful musical performing groups, comprised of **"BRUCE SPRINGSTEEN"** and the group the **"E STREET BAND",** each in commercial use for approximately 50 years. These New Jersey native sons, collective and individually, have released over 30 albums, that have sold over 70 million units nationwide and over 140 million worldwide, making them one of the world's best-selling performers. The Group's (including Mr. Springsteen individually) well known albums include: "Born in the USA" (which has sold over 15 million units); "Live 1975-1985" (which has sold over 13 million units); "Born to Run" (which has sold over 6 million units); "Darkness at the Edge of Town" (which has sold over 3 million units); "The River" (which has sold over 5 million units); "Greetings From Asbury Park" and "The Wild, the Innocent & the E Street Shuffle". The Group's well-known single recordings include: "Born in the USA;" "Born to Run;" "Blinded by the Light;" "Thunder Road;" "Glory Days;" "Badlands;" "Hungry Heart" "Dancing in the Dark;" and "I'm

4

On Fire."  The Group or Mr. Springsteen individually have appeared on television programs broadcast nationwide including: "Good Morning America" (October 25, 2025); "Curb Your Enthusiasm" (Mr. Springsteen, 3 episodes in 2024); "Late Night with Seth Meyers" (November 23, 2022); "The Tonight Show with Jimmy Fallon" (including on November 14, 15, 16, and 24, 2022); the Today Show (including on June 16, 2021); and Saturday Night Live (4 times, most recently November 12, 2020).  Videos of the Group's performances have been broadcast on VH1, MTV and other cable and network programs broadcast nationwide. The Group has won collectively 20 Grammy Awards (awarded by the Academy of Recording Arts and Sciences), among numerous other awards. Mr. Springsteen individually has: won an Academy Award (in 1994 for the song "Street of Philadelphia" from the movie "Philadelphia"); won a special Antoinette Perry "Tony" award for his show on Broadway (2018); and been awarded the Presidential Medal of Freedom (2016). Further, Mr. Springsteen was inducted into the Rock and Roll Hall of Fame in 1999 and the E Street Band was inducted into the same in 2014.

5.　　The mark "**BRUCE SPRINGSTEEN & THE E STREET BAND**" is a federally registered trademark: Registration No. 1697409 for use in connection with International Class ("IC") 41, entertainment services in the nature of a musical group, and IC 009 sound and video recordings featuring music. The mark is incontestable and in its third renewal.  Also federally registered are the trademarks:

5

"**BRUCE SPRINGSTEEN**" Registration No. 4454482 for use in connection with IC 025 T-shirts, sweatshirts, hooded sweatshirts, headwear, and bandanas; IC 009 musical sound recordings, musical video recordings and magnet; IC 016 calendars, souvenir programs concerning rock concerts, lithographic prints, photographs, posters, and greeting cards; and IC 041 entertainment services in the nature of live musical performances and providing online newsletters in the field of music (incontestable); and "**E STREET BAND**" Registration No. 4465269 for use in connection with: IC 025 T-shirts; IC 016 lithographic prints and posters; IC 009 musical sound recordings, musical video recordings, and magnets; and IC 041 entertainment services in the nature of live musical performances (incontestable).

6. This Tour is highly anticipated, so almost all of the concerts are sold out. Because of the Group's status among popular music enthusiasts, the Tour is expected to be a very successful. The Tour involves many large-capacity venues, *i.e.,* arenas seating in excess of 10,000 people. Sales of Authorized Tour Merchandise are expected to be very substantial.

7. The Group derives income and promotes their image in part from sales of recordings and live performances, and in part through the sale of merchandise associated with them. The Group and Plaintiff spend a great deal of care, time and money in developing the Authorized Tour Merchandise bearing the Group's Trademarks, including making sure they are high quality and are appropriate to their

6

image. Plaintiff pays sales tax on each sale and also pays its many employees and third parties to create, manufacture, distribute and sell the Authorized Tour Merchandise, including local individuals.

8.    Authorized Tour Merchandise is sold only at specific locations at each venue.  These locations have a variety of different merchandise for consumers to buy. A true and correct copy of some of the Authorized Tour Merchandise that will be sold at the Group's concerts is attached hereto as Exhibit B and is incorporated by this reference as though fully set forth herein.

9.    Tours by the Group and other performers of their stature have recurring problems with individuals who sell infringing Tour Merchandise near, at and sometime inside each concert venue.  These individuals are referred to as "Bootleggers," their activities are known as "Bootlegging" and their goods are referred to as "Bootleg Merchandise" or "Infringing Merchandise."

10.    The Group's tour has just begun and Defendant Bootleggers have appeared to sell their Infringing Merchandise, as described in more detail below.  To combat such illegal activities on major concert tours, Plaintiff has obtained temporary restraining orders and seizure orders, and thereafter preliminary injunctions and multidistrict seizure orders to seize the Infringing Merchandise from the Defendant Bootleggers, including for the Group's prior major tours.  See Certificate of Counsel filled herewith.

7

11.     At the Group's concerts on Tuesday, April 7, 2026 at the Kia Forum in Los Angeles, California and on March 31, 2026 at the Target Center in Minneapolis, Minnesota, Defendant Bootleggers appeared selling Infringing Merchandise. Plaintiff had those hired (including off-duty or retired law enforcement officers) go into the crowds before, during and after the concert to document the Defendant Bootleggers' activities and their Infringing Merchandise. Some of the results obtained from this concert are contained in Exhibits C, D and E.

12.     True and correct copies of photographs taken of some of the Defendant Bootleggers selling their Infringing Merchandise at the Group's April 7, 2026 Los Angeles concert are attached hereto as Exhibit C.  True and correct copies of photographs taken of examples of the Infringing Merchandise being sold by Defendant Bootleggers at the Group's March 31, 2026 Minneapolis concert are attached hereto as Exhibit D.  All of the Infringing Merchandise contained the same or similar designs and all contained the Group's Trademarks.  True and correct copies of photographs taken of some of the Infringing Merchandise being sold by the Defendant Bootleggers at those concerts are attached hereto as Exhibit E.

13.     Each item of Infringing Merchandise, whether offered for sale at the Group's April 7, 2026 concert in Los Angeles concert (See Exhibit C) or offered for sale during the Group's March 31, 2026 concert (See Exhibit D), was being offered for sale by Defendant Bootleggers solely at the Group's concerts.  Further, each

8

infringing item contains the Group's Trademarks – their federally registered trademarks, likenesses and/or and other indicia of the Group licensed exclusively to Plaintiff.

14.     Defendant Bootleggers sale of their Infringing Merchandise at the concerts preempts Plaintiff's ability to sell the shirts inside and undercuts Plaintiff's price. Defendant Bootleggers sold their Infringing Merchandise along the highways and roads right near the concert venues and in the parking lots, all of which also interferes with traffic and creates safety problems. All offered to sell infringing shirts for on average about $20, but most Defendant Bootleggers agreed to sell for less when asked and especially at the end of the night.  The Infringing Merchandise was often printed on seconds, which we could tell because they had split hang tags, removed tags, or were marked "IR" or "IRR" for irregular or other marking such as a line through the label or red tape. That means they are "seconds"; merchandise being of inferior quality and usually purchased for pennies on the dollar.

15.     In my experience, the Bootlegging problem has grown with the popularity of popular music tours.  In virtually every instance, the Defendants sell identical shirts, indicating that they are supplied from a common source.  Individual Bootleggers are recognized from venue to venue as they follow the tours, or they arrange to have local individuals sell the Infringing Merchandise for them. We usually see a few similar designs being sold by the Defendants throughout the tour.

9

Many designs also have some of all of the tour dates on them, this indicates that they will continue to go from venue to venue and sell their Infringing Merchandise.

16.    Notably, the seizure orders sought are not "universal" orders. The orders are to seize merchandise that infringes on well establish Federal trademark rights, rights that do not change or vary from state to state, pursuant to a specific Federal statute that calls for their seizure.  This application does not seek to enforce all rights for all of Plaintiff's performers, or  to seize infringing merchandise sold at all performers' tours, or to combat all of the many ways that infringers sell their infringing merchandise.  This application is for only this one Group and their performances at specific locations and during specific times.  See Exhibit A hereto.

17.    In the present circumstances, given the Group's popularity, it is not difficult to understand the motives of the Defendants.  All of the concerts on this Tour are expected to be sold out or nearly sold out.  The Group will perform before hundreds of thousands of people by the Tour's end.  The fans attending the various concerts frequently seek to purchase a souvenir, such as a T-shirt.  Defendant Bootleggers are typically located outside the concert venues and therefore have the first and last opportunity to make these sales.  Further some Defendants sell their Infringing Merchandise inside the venues.

18.    Based on my extensive experience in this area, as well as the observed and documented activities of the Defendant Bootleggers at the recent concerts by the

10

Group, without the order we seek, when members of my staff inform Defendant Bootleggers that they are selling Infringing Merchandise, they usually just walk away and/or continue to sell the Infringing Merchandise. The Defendant Bootleggers do not respond when we ask for their names.  All Defendants Bootleggers ignore our requests to stop selling Infringing Merchandise.  The Defendant Bootleggers often respond that they want to see our "injunction" or "order" or else they will not stop their unlawful activities.  Again, from the nature and context of their statements, it is obvious that the "injunction" or "order" they refer to is a search, seizure and impoundment order that we seek from this Court.   The Infringing Merchandise contained the Group's Trademarks, as well as designs, images and logos of the tour which are exclusively licensed to Plaintiff to be sold at venues.

19.    Bootlegging activities greatly injure musical performers, including the Group, and legitimate merchandisers, including Plaintiff, in several ways.  The Defendant Bootleggers are not bound by contract to provide first-quality apparel and graphic designs, as is required by Plaintiff.  Further, the Defendant Bootleggers can drastically undersell Plaintiff, a legitimate merchandiser, because, unlike Plaintiff, Defendant Bootleggers have no obligation to pay the Group royalties and or pay any part of their sales to the concert venue.  This ability to undersell the legitimate Authorized Tour Merchandise is also enhanced by the fact that Defendant Bootleggers do not collect or pay sales or other taxes.

11

20.     The consumer, the fans of the Group also suffer.    Infringing Merchandise is an inferior imitation which rarely lasts very long. The quality of the T-shirts and the designs are poor; many T-shirts appear to be seconds and the colors on the designs tend to "run" or "bleed" into each other. The fans are disappointed and, in their confusion as to the source of the Infringing Merchandise, blame the performers.  This affects future legitimate sales and also tends to create a negative feeling by the fans directed at the performers, which may in turn cause decreased record sales and concert attendance.

21.     The Defendants' Infringing Merchandise is intended and will cause the public to believe that their Infringing Merchandise is authorized, approved and sponsored by the Group. Consequently, not only does the sale of this Infringing Merchandise violate Plaintiff 's exclusive rights, but also causes the general public to be adversely affected and irreparably harms Plaintiff's and the Group's reputations for excellence and integrity in the legitimate Authorized Tour Merchandise.

22.     In my experience and that of Plaintiff, including based on what happened during several prior tours for the Group in which we sought tour seizure orders, usually we see a few same or similar designs being sold by the Defendants throughout the tour. Many designs also have tour dates on them, which also indicates that they will continue to go from venue to venue and sell their Infringing Merchandise. These facts show that the only logical conclusion is that Defendants

must be in active concert and participation with each other. This is because there are thousands of images of the Group and designs associated with them available on the Internet for Defendants to use in his/her Infringing Merchandise, yet usually the same or substantially the same designs - often ripping off Plaintiff's designs created inhouse (and therefore also violate our copyrights) - repeatedly appear on the Infringing Merchandise sold during a tour.

23. The unchallenged presence of Defendant Bootleggers in our marketplace severely damages the market and Plaintiff's business at every level. The precise damage to Plaintiff is incalculable. The Infringing Merchandise sells for approximately half the price (or less) of the genuine Authorized Tour Merchandise and the people involved in the illegal merchandising activities keep no records. Based on my past experience with such Defendants, I believe these Defendants would dispose of or destroy any Infringing Merchandise or related documents should legal proceedings be commenced against them. Further, the incalculable damage caused by the Defendants deprives the rightful owners of their return. Accordingly, we seek to curtail the Bootlegging activities of the Defendants by seeking the assistance of this Honorable Court to obtain an order allowing the seizure of Infringing Merchandise.

24.     The people who serve the orders and seize Infringing Merchandise consist predominately of off-duty law enforcement officers who are well versed in seizing Infringing Merchandise.  They will seize only the Infringing Merchandise and provide receipts.  They *do not* make arrests, as it is a civil seizure order.  The objectives are to serve the restraining and seizure order, preserve the Infringing Merchandise, see if Defendant Bootleggers will provide contact information (which they rarely provide), and provide a receipt, then move onto the next bootlegger.

25.     I believe the difficulties in identifying the Defendants, including that they have no fixed place of business and no assignable assets, makes them virtually immune to normal process or to any process except by way of restraining order against persons unknown to allow the seizure of the Infringing Merchandise pending a final disposition by this Honorable Court.

26.     Plaintiff is a substantial and successful business and will be able to meet any order made to compensate any defendant for any damages suffered as a result of any order obtained on our behalf.  However, in my experience, no Bootlegger has appeared at an order to show cause hearing or sought relief in any of the prior nationwide seizure orders granted.  Plaintiff also requests that it be appointed substitute custodian for the Infringing Merchandise it requests the Court to permit it to seize.

27.    In short, absent protection from the courts in the form of a seizure order, the Defendants have an insurmountable advantage over the performers and merchandisers who obtain the legitimate right to use performers' trademarks, service marks, likenesses, logos and related rights.  Further, the injury is not only to the Plaintiff, but also to the consumers who buy the unlicensed, inferior goods, and experience has shown that the requested order is *the* only effective way to stop the sale of Infringing Merchandise.

I declare under penalty of perjury under the laws of the United States and the State of New Jersey that the foregoing is true and correct.  Executed April 10, 2026.

_____
**EMILY HOLT**

15